# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| In re: | Case No. N12-00514-GS |
| | Chapter 7 |
| STEVEN LEE SAMMONS, | |
| Debtor. | |
| CUMIS INSURANCE SOCIETY, INC., | Adversary No. N12-90033-GS |
| Plaintiff, | |
| v. | |
| STEVEN LEE SAMMONS, | |
| Defendant. | |

## <u>MEMORANDUM DECISION</u>

Plaintiff CUMIS Insurance Society, Inc. ("CUMIS") sued the debtor, Steven Lee Sammons, to recover $923,290.24 that his non-debtor wife, Kathie Sammons, admittedly embezzled from her employer, Whitefish Federal Credit Union ("Whitefish"). CUMIS insured Whitefish. It paid Whitefish $900,000 on its insurance claims, and is subrogated to the credit union's rights. CUMIS now seeks a determination that Steven is liable for his wife's embezzlement, and that such debt is excepted from discharge under 11 U.S.C. § 523(a)(2) and (6) because he knew, or should have known, of Kathie's embezzlement by virtue of the significant amounts of money that moved through some of their joint accounts. Steven denies that he knew about Kathie's embezzlement until after it was discovered by Whitefish. He says he was unaware that embezzled funds were deposited into the joint accounts, or how the funds were used. For the reasons set forth below, I find for the debtor.

**Jurisdiction**

This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I).  This court has

jurisdiction over the dispute in accordance with 28 U.S.C. § 1334(b) and the district court's

order of reference.  This court has the authority to both determine the dischargeability of the

claimed debt, and to liquidate the underlying debt under applicable state law.[1]

**Facts**

Steven and Kathie Sammons have been married for over 30 years, and have five

children.  During the events at issue in this action, they lived in Charlo, Montana.  In 1996,

the Sammons purchased a house in Charlo.  At the same time, Kathie began work at

Whitefish Federal Credit Union.  Starting as a teller, she worked her way to senior loan

officer.

Steven originally worked in Charlo as well, employed as a junior high/high school

principal.  In 1999, Steven accepted a job with the Bering Strait School District as a principal

in Golovin, Alaska.  He has continued to work for the school district in various capacities,

and is currently the school administrator in Shaktoolik, Alaska, another village on the

western coast of Alaska.  Steven's job requires him to spend the school year in Alaska,

usually nine months of the year.  He returns to Montana during Christmas and summer

breaks, and occasionally for spring break, to be with his family.  During the summer months

---

[1] *Sasson v. Sokoloff (In re Sasson)*, 424 F.3d 864, 869-70 (9th Cir. 2005); *see also Dietz v. Ford (In re Dietz)*, 469 B.R. 11, 17-24 (B.A.P. 9th Cir. 2012).

in Montana, Steven operated a painting business, Merriweather Paint, as a sole proprietorship.

At trial, Steven testified that Kathie has always handled the family's finances, including the payment of bills, preparation of tax returns, and obtaining financing when necessary. He further testified that he does not review bank statements, and has allowed his wife to sign federal tax returns on his behalf under a power of attorney. This is corroborated in the Sammons' 2008 federal tax return.[2] Steven's employment in Alaska only increased his reliance on his wife with regard to the family's finances. The cost of his lodging is deducted from his salary, and meals are provided as part of his job with the Bering Strait School District. As a result, he rarely has a need to spend money while in Alaska. Kathie even handles the finances for Steven's painting business during the summers. Because of this, Steven testified that he doesn't know how much the business generates, not even during the summer months when he is in Montana operating the business.

On December 30, 2007, Kathie purchased a second house in Dillon, Montana, to use as a residence for her children who chose to attend the local college, and to rent to other students. Kathie borrowed the money needed to purchase the house from Sam R. McDowell, a long time member of the credit union. She signed a *Promissory Note* in the principal sum of $177,000, bearing interest at 7.5%, payable to McDowell over two years. Under the *Note*,

---

[2] Pl.'s Ex. 9. CUMIS also introduced, and the court admitted, Steven and Kathie's federal tax returns for 2006, 2007, 2009, and 2010. However, these returns were undated, and unsigned, though Kathie testified that they had been filed. The 2008 return was the only signed return admitted into evidence, and Kathie Sammons dated that return December 10, 2013.

3

Kathie was required to make monthly payments of $1,237.61, with a large balloon payment due on December 30, 2009. In short, the loan was amoritzed over 30 years, but payable in two. Kathie executed a *Montana Trust Indenture* to secure the *Note* against the house. Steven testified that he knew Kathie was purchasing a house in Dillon, and that she had procured financing to purchase the house. But he never signed anything related to the purchase, and was unaware of the terms of the purchase. Neither party presented any evidence to explain why the loan was payable in two years, or how Kathie was expecting to make the balloon payment. An escrow accounting of the payments admitted at trial shows that payments continued to be made after December 30, 2009, but the balloon payment was never made. Kathie owed $172,553.61, after the last payment was made on August 2, 2010.

In June 2010, Whitefish discovered that Kathie had embezzled more than $600,000 from it. The exact amount and duration of the embezzlement are unclear.[3] Upon discovery of the embezzlement, Kathie fled the state. At Steven's urging, she returned to Montana and turned herself into federal authorities. Shortly afterwards, Kathie executed a *Deed in Lieu of Foreclosure* conveying the Dillon house back to McDowell. She signed the *Deed in Lieu* and an *Estoppel Affidavit* on August 16, 2010. Both documents were recorded on August 24, 2010. At the same time, however, Steven was in discussions to purchase the property. Less than two months later McDowell conveyed the Dillon house to Steven, who executed a *Promissory Note* in the amount of $176,307.45, payable over 342 months, at $1,250 per

---

[3] CUMIS alleges in its *Complaint* that Kathie embezzled $1,075,211.90. Docket No. 1 at 3.

month.  The *Note* references a Montana Trust Indenture to secure the obligation, but no such document was submitted into evidence.

Roughly a year after discovery of the embezzlement, on July 11, 2011, Kathie pled guilty to two counts of criminal misconduct relating to her position as an employee of Whitefish, including embezzlement from a credit union in violation of 18 U.S.C. § 657, and money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(I).  The United States District Court for the District of Montana entered judgment against Kathie in the amount of $677,072 on July 6, 2011.  The Department of Justice recorded a *Notice of Lien* in Beaverhead County, Montana on October 7, 2011.[4]

On November 2, 2011, Whitefish and CUMIS sued Kathie and Steven for civil theft, conversion or theft by deception, unjust enrichment and imposition of a constructive equitable trust.  On August 26, 2012, prior to entry of any judgment against him, Steven filed his chapter 7 petition.  His bankruptcy schedules disclose that, at the time of filing, he owned the Charlo and Dillon houses, a 1998 Ford Expedition (valued at $3,650), a 2002 Chevrolet ½ ton Silverado (valued at $8,947), and a 2008 Harley Davidson Road King Classic motorcycle (valued at $14,700).  There was testimony, consistent with his Schedule B, that Steven also co-signed loans so two of his children could purchase vehicles as well.   The houses and all of the vehicles except the Expedition were encumbered.

Sometime prior to Steven's bankruptcy filing, the Sammons purchased two snow machines, two all terrain vehicles, and two Sea-Doo jet skis.  Although these items were

---

[4] The Dillon property is located in Beaverhead County.

5

purchased during the time Kathie was employed by Whitefish, no evidence was submitted to show exactly who purchased them, when the items were purchased or their purchase prices, or how the Sammons paid for the items. Steven was involved in the purchases of the snow machines and all terrain vehicles, as they were purchased in Alaska for his use during the school year. He believed that they were purchased at various times using loans from Whitefish, procured by Kathie. Steven stated that he asked Kathie whether they could afford to make the monthly payments to purchase the items, and relied upon her assurance that they could. Steven also testified that these items were not all owned together at any one time. According to responses to interrogatories admitted into evidence at trial, the snow machines and all terrain vehicles were sold at least four years ago. None of the snow machines, all terrain vehicles, or jet skis were listed on Steven's bankruptcy schedules.

At trial, CUMIS presented evidence taken from the Sammons' federal tax returns that between 2006 and 2010, their total gross wages ranged from $97,500 to $117,100. During this same time period, gross revenues for Steven's sole proprietorship, Merriweather Paint, fluctuated between $2,250 and $16,374, although net revenue ranged from a loss of $2,000 to a high of $6,080. Beginning in 2007, the Sammons also reflected losses from the rental of the Dillon house, and Steven received the Alaska Permanent Fund Dividend.

CUMIS also admitted into evidence bank statements from accounts held at First Citizens Bank and Glacier Bank. The accounts were jointly held by Kathie and Steven, although their salaries were not deposited into either account. Both of their salaries were direct-deposited into another joint account, held at Whitefish. No bank statements from

6

Whitefish were submitted into evidence.  The statements from First Citizens Bank are limited to 2007, and show $151,253.72 deposited into that account.  The statements from the Glacier Bank joint account are for 2008, and reflect $95,341.27 deposited into the account.  CUMIS also admitted into evidence bank statements for another joint account at Glacier Bank, for Steven's paint business, Merriweather Paint.  Those statements show that $32,672 was deposited in 2007, and $42,387.60 was deposited in 2008.  Combined, these exhibits demonstrate that the monies deposited into the First Citizen and Glacier Bank joint accounts exceeded the Sammons' wages and revenue from their paint business:

|  | 2007 | 2008 | Total |
|---|---|---|---|
| Wages and Merriweather Gross Revenue | $    97,502.00 | $    117,130.00 | $    214,632.00 |
| Deposits into First Citizens and Glacier Bank Joint Accounts | $    183,925.72 | $    137,628.87 | $    321,554.59 |
| Annual Ending Balance - Combined Accounts | $    671.48 | $    1,736.62 | |

## Analysis

CUMIS contends Steven is jointly liable with Kathie for the embezzled funds, and seeks to except this debt from discharge.  Because Steven's liability was not liquidated prepetition, the dischargeability analysis requires two steps:  first, whether a debt exists as to Steven under applicable state law, and second, whether the debt is excepted from discharge under § 523(a).[5]  If there is no debt, the second step in the analysis is unnecessary.[6]

---

[5] *Banks v. Gill Distrib. Centers, Inc.*, 263 F.3d 862, 868 (9th Cir. 2001); *see also Gidelski v. Anton (In re Anton)*, 2013 WL 1747907, at *2 (Bankr. E.D. Mich. Apr. 12, 2013).

[6] *Anton*, 2013 WL 1747907, at *2.

7

While the nondischargeability of a debt under § 523(a) is a question of federal law, the initial question of Steven's liability to CUMIS is one of state law.[7]

CUMIS asserts claims for nondischargeablility of a debt for money obtained by false pretenses, false representations, or actual fraud under 11 U.S.C. § 523(a)(2)(A), and for willful and malicious injury resulting from conversion under § 523(a)(6).[8] It seeks a money judgment of $923,290.24 against Steven because of the "fraud and conversion to which he was a party."[9] Yet, the *Complaint* fails to differentiate between the causes of action necessary to establish the debt, and those to establish nondischargeablility.

CUMIS alleges that Steven was aware of Kathie's embezzlement, and participated in the fraudulent activity, because of the substantial sums of money that were deposited into joint bank accounts and the substantial outlays from those accounts to pay for various purchases and expenses. It also alleges that Steven demonstrated an intent to cause willful and malicious injury because he failed to inform Whitefish that he was benefitting from the embezzled funds. The *Complaint* lacks specific allegations that would support the predicate claim for fraud or conversion, and fails to identify any other legal theory under which Steven would be liable to CUMIS for the debt. The evidence submitted at trial did not fill these gaps.

---

[7] *Banks v. Gill Distrib. Centers, Inc.*, 263 F.3d at 868.

[8] The *Complaint's* prayer asked that the debt be excepted from discharge under § 523(a)(4), in addition to §§ 523(a)(2) and (a)(6). Section 523(a)(4) excepts from discharge a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). However, because a claim for relief under § 523(a)(4) was not set out in the *Complaint*, or pursued at trial, the court makes no findings on this point. *Jodoin v. Samayoa (In re Jodoin),* 209 B.R. 132, 136 (B.A.P. 9th Cir. 1997) ("Generally, a party cannot succeed on a cause of action not stated in the complaint.").

[9] *Complaint* (Docket No. 1), at 7 ¶30.

As often occurs in these types of cases, CUMIS attempts to establish Steven's liability by using Kathie's wrongdoing and the existence of joint accounts into which it argues embezzled funds were deposited and used. While Kathie's guilty plea establishes her embezzlement, Steven's liability is not so easily determined. Liability for Kathie's embezzlement does not automatically attach to Steven simply by virtue of their marriage.[10] Rather, Steven may be held liable to CUMIS if he obtained money or goods from Whitefish by false pretenses, false representations, or actual fraud. [11]

CUMIS does not argue that Steven knowingly made false statements to Whitefish, as required to establish fraud.[12] Rather, it asserts direct claims for conversion and civil conspiracy. As to the conversion claims, CUMIS does not contend that Steven was personally involved in the embezzlement of the funds from Whitefish. Charitably construed,

---

[10] *Tsurukawa v. Nikon Precision, Inc. (In re Tsurukawa)* ("*Tsurukawa I*"), 258 B.R. 192, 198 (B.A.P. 9th Cir. 2001); *see also Haig v. Shart (In re Shart)*, 2013 WL 1397401, at *8 (B.A.P. 9th Cir. April 2, 2013).

[11] Courts have imposed vicarious liability upon one spouse for the wrongful acts of the other if there is an independent basis to impute liability under state law. Generally, this requires that the creditor prove a partnership or agency relationship between the spouses with respect to the wrongful act. *Compare Tsurukawa v. Nikon Precision, Inc. (In re Tsurukawa)*, 287 B.R. 515, 527 (B.A.P. 9th Cir. 2002) (partnership relationship found where wife assumed active role in husband's business, beyond merely holding a community property interest in, and performing minor services for, the business); *Haig v. Shart (In re Shart)*, 2013 WL 1397401, at *8 (B.A.P. 9th Cir. April 2, 2013), *remanded to Haig v. Shart (In re Shart)*, 505 B.R. 13 (Bankr. C.D. Cal. 2014)(wife's occasional maintenance of joint business bank account was insufficient evidence of an agency or partnership relationship with respect to husband's fraud). Throughout this proceeding, CUMIS' position has been that Steven was a knowing and willful participant in the wrongdoing. It never alleged, or argued, that Steven could be held vicariously liable because he and Kathie were in a partnership or agency relationship with respect to the embezzled funds. Therefore, the court does not address that theory here.

[12] This finding is required to establish fraud under both Alaska and Montana law. *See Nicdao v. Chase Home Finance*, 839 F.Supp.2d 1051, 1073 (D. Alaska 2012)("In Alaska, '[c]ommon law fraud claims require a showing of (1) a false representation of fact; (2) knowledge of the falsity of the representation; (3) intention to induce reliance; (4) justifiable reliance; and (5) damages.'''); *Bartlett v. Allstate Ins. Co.*, 929 P.2d 227, 231-32 (Mont. 1996)(elements of fraud include "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; [and] (5) the speaker's intent that it be relied on[.]").

it argues that Steven exercised dominion and control over Whitefish's funds through the use

of the embezzled funds after they were deposited into the Sammons' joint accounts by

Kathie. Similarly, a claim for civil conspiracy would hinge upon Steven's knowledge about

and use of the embezzled funds once they were placed into the joint accounts.[13] To find

Steven directly liable to CUMIS, this court must find that his knowledge of, and participation

in, the embezzlement can be inferred from the flow of funds in and out of the joint accounts.

The bankruptcy court in *In re Cottingham*[14] did exactly this. The debtor's wife

embezzled escalating amounts of money from her employer over a period of years, stealing

well over $200,000 per year from the company in the three years prior to getting caught.

During those years, the combined salaries of the wife and debtor ranged between $83,000 to

$97,000. The couple had joint bank accounts, and both of them wrote checks for their living

expenses. The debtor signed tax returns and a loan application detailing their finances. The

debtor also wrote checks for a computer, to pay past due taxes, and to purchase one vehicle.

He was also present for the subsequent purchase of another vehicle, made just days after an

embezzled check was deposited into the couple's joint account.

After the couple filed a chapter 7 petition, the wife's employer sued to except the debt

from discharge under 11 U.S.C. § 523(a)(6) as one arising from a willful and malicious

injury. The bankruptcy court, after evaluating several years of detailed financial activity that

---

[13] Civil conspiracy requires intent and knowledge by all participants. *See Summers v. Hagan*, 852 P.2d 1165, 1169 (Alaska 1993)(participation in a fraudulent conveyance scheme requires a finding that each participant specifically intended to hinder, delay and defraud a creditor); *Schumacker v. Meridian Oil Co.*, 956 P.2d 1370, 1373 (Mont. 1998)(civil conspiracy requires a meeting of the minds between the participants on the object to be accomplished).

[14] *Ewers v. Cottingham (In re Cottingham)*, 473 B.R. 703 (B.A.P. 6th Cir. 2012).

had been submitted by the employer, found that the debtor had participated in the family finances and that there was an increasing level of spending that far outstripped the couple's earnings.  From his active participation in the use of the monies, the court inferred the debtor's knowledge of his wife's wrongdoing, and found that his professed ignorance was not credible.  Judgment was entered in favor of the employer.  On appeal, the B.A.P. for the Sixth Circuit held that liability for civil conspiracy could be "derived from concerted action of one or more persons whereby liability is imposed on one for the tort of another and properly found that a defendant's knowledge of and participation in a conspiracy can be inferred from the evidence presented to the court."[15]  The B.A.P. affirmed the bankruptcy court's judgment excepting the debt from discharge, agreeing that the debtor "could not reasonably have believed that their lifestyle was supported by their earned income."[16]

The court in *In re Anton*[17] considered similar claims but reached a different conclusion.  *Anton*, like *Cottingham*, was a joint chapter 7 case.  Mr. Anton was an engineer whose employment required him to travel frequently.  Because of this, his wife was predominantly responsible for managing the couple's finances.  Anton did not routinely review bank statements or other financial documents, and entrusted the filing of tax returns to his wife.  Unbeknownst to him, his wife misappropriated more than $200,000 from her mother, Gildeski.  After the debtors filed bankruptcy, the mother brought an adversary proceeding against both debtors for nondischargeablility under § 523(a)(2)(A), (a)(4), and

---

[15] *Id*. at 710.

[16] *Id*. at 711.

[17] *Gildeski v. Anton (In re Anton)*, 2013 WL 1747907 (Bankr. E.D. Mich. Apr. 12, 2013).

(a)(6).  In a subsequent state court criminal action, the wife pled guilty to the crime of larceny, which served as the basis for a nondischargeablility judgment against her under § 523(a)(4).  Anton, however, was not a party to the criminal action, and Gildeski's claims as to him went to trial.

Anton testified that he first learned that his family had financial problems when he was laid off from his job.  At that time, his wife told him they were deeply in debt.  He learned of her wrongdoing the following month, when the couple consulted with a bankruptcy attorney.  Before the couple filed bankruptcy, Anton had earned between $81,871 to $87,128 per year.  His wife was unemployed.  She paid all the family's financial obligations, including private school tuition, and arranged for home improvement work on the couple's home that cost between $35,000 to $40,000.  Anton trusted his wife's judgment in these matters, and was not involved in the details of the home improvement.

Gildeski advanced the same argument CUMIS makes to this court:  Anton knew, or should have known, of his wife's wrongdoing, and should have questioned the source of funds that she was depositing into the joint accounts, which he also used.[18]  To determine Anton's liability, the court looked at the totality of the circumstances, including whether he knew of his wife's wrongdoing, and the participation and benefit from it.[19]  The court found that Anton had benefitted, because the misappropriated funds were applied to family expenses.  Moreover, as in *Cottingham,* the Antons' household income had increased, by

---

[18] *Id.* at *1.

[19] *Id.* at *6.  The court noted that knowledge of a spouse's misconduct, alone, would not give rise to liability; "knowledge must be concurrent with participation in the use or enjoyment of the stolen property in order for liability to attach."  *Id.* (citing *In re Magpusao*, 265 B.R. 492, 498 (Bankr. M.D. Fla. 2001)).

about 45%, while the scheme was ongoing. From this, Gildeski argued that Anton's claims

of innocence were insincere and disingenuous. However, the court was unwilling to infer

knowledge of the wrongdoing in light of the totality of the circumstances:

> Mr. Anton did not "stick his head in the sand,"
> but rather was genuinely and legitimately
> unaware of the Scheme. This was not a case of
> willful blindness, . . . .  Mr. Anton's lack of
> awareness of the Scheme is attributed to his
> extended absences from the household and his
> reliance on his wife's financial management,
> rather than any effort to remain willfully blind.
> While it may be argued that it would have been
> prudent for Mr. Anton to exercise some amount of
> oversight over his wife's financial management,
> he had no reason to           suspect wrongdoing,
> nor to make an inquiry into the finances.[20]

To the court, this was the more significant factor in determining Anton's liability to

Gildeski. Given Anton's lack of knowledge, Gildeski could not establish a claim against him

for civil conspiracy, embezzlement, larceny, false pretenses, false representation or actual

fraud.[21]

As did the creditors in *Cottingham* and *Anton*, CUMIS urges this court to find that

Steven knew about Kathie's embezzlement because of the large sums of money passing

through the couple's joint bank accounts. It contends that Steven benefitted from the

embezzled funds because they funded a lavish lifestyle which included numerous vehicles,

snow machines, all terrain vehicles, jet skis, and a rental property. Although the arguments

---

[20] *Id.* at *8.

[21] *Anton*, 2013 WL 1747907, at *9.

13

are similar, *Cottingham* and *Anton* demonstrate that the dischargeability determination hinges upon the facts of each case. Here, the evidence presented at trial simply does not support CUMIS' position. First, the evidence is that Kathie embezzled $677,072 from Whitefish. CUMIS has established that roughly 48% of this amount, or $321,554.59, was deposited into the Sammons' joint accounts during 2007 and 2008, with less than $1,500 remaining in each separate account as of December of those years.[22] While the court is willing to accept that some, if not all, of the monies deposited into these accounts were embezzled from Whitefish, there is nothing to suggest what might have happened to the remaining $350,345.41 of embezzled funds. Moreover, CUMIS made no effort to provide an accounting of the funds that it contends were run through the joint accounts. The court simply has no idea how the monies were spent, nor is there any evidence of who spent the funds. The testimony at trial was that Steven rarely, if ever, wrote checks from the joint accounts, though he took some blank checks with him to Alaska in case he needed money.

As in *Cottingham,* CUMIS contends the Sammons lived an extravagant lifestyle in excess of their earnings based upon their multiple cars and rental property. Yet, CUMIS did not attempt to detail their monthly income or actual expenses. The debtor owns a 1998 Expedition, a 2002 Silverado, a 2008 Harley Davidson, and he co-signed for a 2000 BMW and a 2002 VW Jetta for the children. There are outstanding loans on all of the vehicles except the 1998 Expedition, but no evidence to show that these purchases were extravagant

---

[22] This excludes the joint account at Whitefish where the Sammons directly deposited their wages. No information for that account was provided at trial.

14

when they were made.  There is also no evidence showing who made the loan payments, or

that embezzled funds were used to make the payments.  Assuming the children, rather than

Steven, made the payments on the two loans he co-signed, the fact that the two loans were

made would be insignificant.  Similarly, the court cannot give much weight to the Sammons'

payment of college expenses for two of their children to attend a state university, because

there is no evidence as to who paid the expenses, the amounts expended, the source of the

payments, or the duration of time over which payments were made.

For the same reason, the court is unable to draw any inferences from the debtor's

ownership of snow machines, all terrain vehicles, or skidoos.  Nothing in the record

establishes when, or how, such items were purchased.  The only details provided regarding

these items were through Steven's testimony.  He stated that the items were not all owned

at the same time, he asked Kathie if they could afford the monthly payments, and he sold the

snow machines and all terrain vehicles at least four years ago.

The lack of any accounting also precludes the court from drawing any inferences

from the purchase of the Dillon house in 2007.  Kathie acknowledged that she did not seek

a traditional loan to purchase the property because she knew she would not qualify for such

financing.  The loan she obtained from Mr. McDowell required monthly payments of

$1,237.61, with no down payment, and a balloon payment after two years.  The escrow

accounting of payments on the note admitted at trial shows that beginning in February 2008,

the loan was paid regularly, although there was no evidence presented to establish whether

the Sammons' wages would support such payments.  The tax returns for 2008 through 2010

15

show that the Sammons received some rent in each year.  Significantly, CUMIS did not attempt to trace the note payments.  Without this information, the court simply cannot tell whether embezzled proceeds were used to make monthly mortgage payments for the Dillon house.[23]

The facts presented at trial place Steven's participation in the family finances much closer to those found in *Anton* than in *Cottingham.*  Steven testified that he deferred to his wife on all financial matters, largely because he was in Alaska for roughly three quarters of the year.  He did not review bank statements or tax returns; he gave Kathie a power of attorney to sign the returns on his behalf.  He also left all required financing to his wife, and understood that they had a number of loans, most of them from Whitefish, his wife's employer, except for the Dillon house.[24]  I find that Steven Sammons' testimony on these matters, including his lack of knowledge of the monies deposited into the First Citizen and Glacier Bank accounts, was credible.  Considering the Sammons' family situation, with Steven's extended absence from the family home, it was not unreasonable for him to delegate all financial matters to Kathie.  Nor was it out of the norm for their relationship.  Steven believed she was capable of properly handling the finances, and, in his eyes, she had done so for years.

---

[23] At trial, Kathie denied using embezzled funds to make the monthly mortgage payments on the Dillon house.

[24] The debtor's *Schedule D* confirms this fact.  It lists the McDowell mortgage, and five secured loans with Whitefish, including another mortgage, three vehicle loans (including the two co-signed loans), and the Harley loan.  *See Schedule D*, filed in Main Case No. 12-00514 (Docket No. 1 at 15-16).

16

In *Cottingham*, the creditor established that the family's rapidly increasing spending habits raised a clear, red flag that the spouse could not ignore. This case is much closer to the situation presented in *Anton*, however, because there is no evidence of any warning signs that might have caused Steven to doubt Kathie's capabilities regarding their finances. In *Lansdowne v. Cox (In re Cox)*,[25] the Ninth Circuit held that a spouse "who has delegated the responsibility for maintaining the financial records need not inquire about those records absent some reason to be suspicious that they are not being kept properly."[26] In *Lansdowne,* the debtor had relied upon her husband to take care of all family finances. She did not inquire into the family's financial affairs, even though she had been nominally involved in some of her husband's businesses. The husband's business deals soured. He was pursued by angry creditors and ultimately became a fugitive from the law. An involuntary chapter 7 petition was filed against the debtor. The trustee objected to her discharge under 11 U.S.C. § 727(a)(3) for failure to maintain adequate books and records. The bankruptcy court found that the debtor was "living in a mental and physical cocoon" by relying upon her husband to keep proper records, and denied her discharge.[27] The Ninth Circuit overruled. Looking at the totality of circumstances, it found that the wife's reliance on her husband was reasonable based upon a clear division of labor as to management of the finances, the debtor's belief that

---

[25] 41 F.3d 1294 (9th Cir. 1994).

[26] *Lansdowne v. Cox (In re Cox)*, 41 F.3d 1294, 1299 (9th Cir. 1994).

[27] *Id.* at 1298.

17

her spouse was capable of managing the finances, and the absence of any warning that her husband was not properly managing their financial dealings.

There is no evidence that Steven actually knew of Kathie's embezzlement, nor is there evidence of any red flags that would have alerted him that something was wrong. Moreover, Steven's testimony credible. I find that he was unaware of his wife's embezzlement while it was ongoing. Given the totality of circumstances, including Steven's credibility, his lack of participation in the family finances, his history of deferring to Kathie on all financial matters, and his extended periods of employment in Alaska, I conclude that knowledge of the embezzlement cannot be inferred from the evidence that has been presented here. Steven's lack of knowledge precludes CUMIS's direct claims for fraud, conversion, or civil conspiracy.

## Conclusion

I find that Steven was unaware of the embezzlement while it was ongoing. He lived away from the family home for extended periods and relied on his wife to handle all family finances. He did not check bank statements, and relied on Kathie to prepare tax returns and take care of the finances for the seasonal paint business. He had no warning signs to indicate that something was amiss until after Kathie's misconduct became apparent to Whitefish. There is insufficient evidence to charge Steven with knowledge of the embezzlement, such that liability for such wrongdoing may be imposed upon him. For these reasons, CUMIS' claims will be discharged and its *Complaint* will be dismissed, with prejudice.

An *Order* and *Judgment* will be entered consistent with this *Memorandum*.

DATED:  March 27, 2014.

BY THE COURT

/s/ Gary Spraker
GARY SPRAKER
United States Bankruptcy Judge

Serve:        D. Bundy, Esq.
              P. Collins, Esq.
              G. Sleeper, Esq.

19